■ In the Matter of the Claim of ION PAVAN, Respondent. UTOG 2-WAY RADIO ASSOCIATION, INC., Appellant; THOMAS F. HARTNETT, as Commissioner of Labor, Respondent.—Mercure, J. Appeal from a decision of the Unemployment Insurance Appeal Board, filed November 20, 1989, which ruled that claimant was entitled to receive unemployment insurance benefits.

At issue in this proceeding before the Unemployment Insurance Appeal Board is whether claimant was an employee of UTOG 2-Way Radio Association, Inc. (hereinafter UTOG) or, rather, an independent contractor. Because it is our view that the Board's own findings of fact do not support its conclusion that UTOG "exercised sufficient direction and control over the services performed by the claimant to establish his identity as an employee", we reverse.

UTOG is a nonprofit membership corporation organized and existing for the purpose of coordinating and facilitating the business of its members, self-employed limousine owners oper-

ating within New York City. Claimant was such a member. Upon his purchase at market value ($40,000 in claimant's case) of a transferrable membership interest in UTOG, a member is furnished with a two-way radio set for UTOG's frequency, and thereafter benefits from UTOG's dispatch services and its solicitation, billing and collection of accounts, performed by office personnel carried as employees on UTOG's books. Under UTOG's constitution and bylaws, all members have the right to vote in the election of officers and committee chairpersons, to serve as committee members, and to participate in the development and implementation of rules and regulations governing the conduct of the members. Because of fierce competition among the 70 or 80 similar radio groups operating within New York City, prospective members are screened by the membership committee to ensure that the aspirant meets UTOG's standards for dealing with the public. Further, rules governing appropriate appearance and behavior of the member and the condition of his limousine are enforced. Each member owns his own limousine, a black or silver Cadillac or Lincoln, and is solely responsible for the cost of gasoline, licensing, insurance, maintenance and repairs.

Although UTOG operates its service 24 hours per day, members are given no set hours of operation and can work as much or as little as they want. However, they are "expected" to be available for assignments during the morning and evening rush hours, described as UTOG's "livelihood", and to let the dispatcher know when they will be unavailable for extended periods of time. A member may drive his own limousine or hire someone else to drive it for him. A driver puts a limousine into service by pushing a button on the radio, which in turn activates a light at the dispatch center or base. The dispatcher then offers assignments throughout the driver's tour, specifying the customer's place of pickup and destination. A driver is under no obligation to accept any particular assignment, but is obligated to complete an assignment once accepted. Generally, the customer directs the route to be taken and pays for tolls incurred in the assignment. Although drivers are prohibited by regulations of the New York City Taxi and Limousine Commission from making random customer pickups, they are not precluded from performing similar services for other organizations or making personal use of the vehicle when they are not performing an actual assignment for UTOG. UTOG provides an industry-standard voucher form, suitable for use by it or competing services, which the driver completes and the customer signs.

The member is paid the full amount of earned fares less a service fee of 10%, if he is willing to wait for actual payment to UTOG, or 15%, if the driver desires immediate payment. In the event of consistent rule violations, UTOG's executive committee is empowered to expel a member, who is then paid the current market value of a membership ($41,000 in claimant's case) upon the return of UTOG's two-way radio.

In our view, the indicia of control relied upon by the Board, including the membership committee's screening of prospective members, the requirement of a neat appearance, a clean car and satisfactory performance, the requirement that members obtain and utilize UTOG's two-way radio and own a vehicle meeting UTOG's specifications, the expectation that members would work during rush hours, the requirement that they complete accepted assignments, and UTOG's receipt of payment for the assignment and any customer complaints, evidence, at most, "incidental control over the results produced without further indicia of control over the means employed to achieve the results" *(Matter of Ted Is Back Corp. [Roberts],* 64 NY2d 725, 726). Absent these insignificant controls, UTOG could not possibly conduct its business *(see, supra).* It need hardly be stated that a cooperative association of limousine owners cannot exist without limousines and owners and that two-way radio communication cannot be maintained without two-way radios. Further, without competent drivers willing to maintain industry standards of appearance and conduct, to work during peak periods and to complete assignments, UTOG's business would be lost to the competition *(see, Matter of Green Engraving Corp. [Roberts],* 95 AD2d 904, 905). Notably, here, as in *Matter of Ted Is Back Corp. (Roberts) (supra),* the members work at their own convenience, are free to hold outside employment, are not limited to any particular territory, are not reimbursed for expenses and receive no salary or drawing account. The fact that customer payments and complaints are delivered to UTOG is nothing more than a testament to UTOG's intended function as an intermediary between the customers and drivers. In the simplest of terms, UTOG is the instrument and not the employer of the independent limousine owners who comprise its membership. They are not subject to its control; rather, UTOG is subject to their control.

Decision reversed, without costs, and matter remitted to the Unemployment Insurance Appeal Board for further proceedings not inconsistent with this court's decision. Casey, J. P., Mikoll, Mercure and Crew III, JJ., concur.

Yesawich, Jr., J., dissents and votes to affirm in a memorandum. Yesawich, Jr., J. (dissenting). I respectfully disagree.

There is, as the majority recounts, an evidentiary basis from which the Unemployment Insurance Appeal Board could have concluded that claimant was an independent contractor. There is, however, also sufficient evidence on the record as a whole from which the Board could find, as it did, that claimant's relationship to UTOG 2-Way Radio Association, Inc. (hereinafter UTOG) was that of an employee. Accordingly, the Board's decision is beyond further judicial review *(see, Matter of Rivera [State Line Delivery Serv.—Roberts],* 69 NY2d 679, 682, *cert denied* 481 US 1049). For example, UTOG required its drivers, including claimant, to do the following: meet UTOG's dress and behavior standards; be available during morning and evening rush hours; notify UTOG if they planned to be on vacation; pay monetary penalties if they did not perform their jobs satisfactorily; purchase and utilize UTOG's two-way radio dispatch service; buy vehicles which met UTOG's specifications, namely, silver Cadillacs or Lincolns; use a voucher system UTOG had established; and carry voucher forms with the latter's name to enable them to obtain payment from UTOG for their fares. Finally, UTOG determined the amount of these fares. Given the foregoing, it cannot be said, as a matter of law, that the Board wrongly found that an employment relationship existed *(see, Matter of Morton,* 284 NY 167, 170). The Board's determination must therefore be affirmed *(see, Matter of Rivera [State Line Delivery Serv.—Roberts], supra; Matter of Field Delivery Serv. [Roberts],* 66 NY2d 516, 517-518; *Matter of Furno [Panasonic Co.—Roberts],* 102 AD2d 937, 938, *lv denied* 63 NY2d 610).